at all. At this time, would counsel for the appellants please come to the podium and introduce yourself on the record. Good morning. Sarah Welch on behalf of the United States. I'd like to reserve four minutes for rebuttal, if I may. You may. May it please the court. The government seeks to remove aliens with final orders of removal who do not contest their removability. Each has already received the full process available to contest removability, often stretching on for years. You said for removability, but I just want to make sure I understand exactly what the government is doing. So the regulations require that an immigration judge in a removability case identify the country or countries to which the alien may be removed in the first instance, correct? That's right, your honor. And that happens, and countries are declared. But under 1231, I'm going to just focus on B-2. I understand there's B-1 and B-2, but let's just talk about B-2, which is someone who came in the country at some point and maybe overstayed a visa or something, right? So if someone did that, they had an order of removal telling them a certain country, and that country becomes unavailable, then 1231 B-2 provides a list of other countries, correct? That's right, your honor. And if you go through a whole bunch of them, other options, and those all prove impracticable or some other adjectives, then you can pick a third-party country. Am I right so far? That's right, your honor. And then the statute doesn't say you are without any rights at that point. It then says, except that under 1231 B-3, you can't use 1231 B-2 to remove someone to a country which their life or freedom would be jeopardized based on a number of potential categories. Am I right so far? That's right, your honor. And there's a footnote that drops you down to the notes of that statute that takes you to that's where FARA is codified, and says that everyone, every person cannot be sent to a country where they will be tortured, basically. There are some other words there, but am I summarizing that fairly? That's right, your honor. The other words are just defining what torture means. Okay. So the statute contemplates, as Lisa, I understand you've said so far, is the government has the authority to pick a country outside of the final removal order and to remove a person there, subject to other processes to make sure that that is an acceptable place for the person to go. And if I look at 1231 B-3, C, which is within the statute, and I understand all your jurisdictional arguments that we will get to, but it talks about a hearing, right? It talks about who has the findings of fact, the trier will determine who has the burden, all those things that one thinks of as having a hearing, right? Yes, your honor. Right, so far? And if I go to the regulations, 1230, 1208.16, which is the regulation for withholding of removal under 1231 B-3, and the CAT, it talks about an applicant making an application, and then it puts out the basically how the hearing is going to work. Am I right about that, too? Yes, your honor, referring to withholding of removal. And so the government finds its authority to remove people to third-party countries in B-2, correct? That's where the authority comes from, to send someone to a third-party country? I believe it's B-2, yes, your honor. Okay, and what are you doing to make sure that you are exercising B-2 in accord with the limitations imposed in B-3? Because, so if, I mean, a hearing, I'm sure you learned like I learned in law school, that a hearing, notice is part of a hearing, and so what are you doing to make sure that you're exercising B-2 in line with B-3? And I know this is not addressing all of your jurisdiction arguments, but I just want to understand, what are you doing to make sure that these B-3 hearings are happening? Because Congress didn't give you the absolute authority to send people to third-party countries. It gave you that authority subject to provisions that give people the ability to challenge, to protect themselves, so what are you doing in that regard? Yeah, so a couple of responses. So one, just to clarify, there are two kinds of relief that the plaintiffs addressed in their complaint. Those are withholding of removal and convention against torture removal. Those are two distinct claims, and we're only here regarding convention against torture. I understand that, but I guess I want to understand, before we get to all of that, and that gets all complicated, and I'm not saying you don't have good arguments, I just want to understand what is being done to make sure that people have a chance to bring B-3 and CAT claims, which I feel like at least B-3, it seems like that was part of what Congress thought about, to make sure that that is happening in real and not some pie-in-the-sky idea. Yes, and the second point I wanted to make about how the statute works is that the B-2C, disregarding of a designation, occurs both during removal proceedings, when the Attorney General or the attorneys before the IJ are choosing a country, they're designating a country that would take over what the alien's preferred choice is, as well as after removal proceedings have concluded. So the processes in the statute are playing out both in that context, during removal proceedings, as well as afterwards. So we're here about the afterwards part. It is true there could be a final order of removal, I'm just going to make up countries, a final order of removal says you will be removed to Guatemala, and then that becomes impossible or impracticable, and all the other options are not available, and the government later decides we can send you to Sudan, and so that's what's going to happen. That authority rests with the government, and I think it does, and if it does, it rests under B-2, right? That's where that authority comes from. I believe so, Your Honor. And it would not be what's in the final removal order. That would have said Guatemala, but you don't have to go back and reopen the removal. Your position is that you have to go back and reopen the final order of removal, or amend the final order of removal. Your position is we don't have to do any of that. B-2 doesn't make us do any of that. We can just select a third-party country, and I think it does allow that. Do you agree with me so far? We don't have to go back and reopen the removal. Do you also agree that that is subject to, putting aside jurisdictional problems, that is subject to the provisions of B-3, that power that we just discussed? I believe so, Your Honor. If you look at B-3, doesn't that say subject to paragraphs 1 and 2? Not withstanding paragraphs 1 and 2. Not withstanding paragraphs 1 and 2. So forget about whatever paragraph 2 said, which is we can send you to a third-party country. This procedure laid out in 3 will happen, and B-3 will happen. That's at least what Congress wrote, right? Your Honor, I do agree that's what B-3a says. And B-3c talks about a hearing, doesn't it? It does, Your Honor. And do you agree with me that basic sort of first-year malign teaches you that hearings and notice are nestled together? I imagine you learned that a hearing without notice of what the hearing is or how to do it, that's not what we mean in this country by a hearing. I do agree with you on that, and there are extensive regulations about what the notice is. Aside from what our power is, what is the government doing to make sure that people who have been designated post-final removal order, let's focus on those people, can exercise their rights under both B-3 and the CAT? Sure, Your Honor. So the policy that we're here discussing divides aliens into two groups. And if I could just one last minute on the statute before we move on, we've been talking about B-2, which refers to one set of aliens versus B-1, which is different, so of course they're both out there notwithstanding B-1 and B-2. Yes, Your Honor. So the policy that we're here on divides aliens into two categories. One is those for whom the government has diplomatic assurances that have been deemed credible by the executive branch. The regulations implementing the Convention Against Torture specify that when that occurs, CAT proceedings come to a close. That's 208.18c. There's no further proceedings because there's no basis. And I understand that they haven't raised that here because I think they think the jurisdictional things, but I still want to understand what you're doing about that. So what authority do you have to say we don't have to give people notice to have a B-3 hearing, which it seems to be what Congress thought of as the remedy when it wrote B-2 and B-1? Your Honor, I'm not prepared to discuss B-3 further because it's not one of the provisions that were here on the district court's injunction. Page 27 of the addendum doesn't cover withholding, and the plaintiffs agree in footnote 13 of their brief that we're not here on that. We're here purely on Convention Against Torture claims, which are implemented by executive branch regulations that specify that when there are credible diplomatic assurances. Okay, that's fine. We'll move on. But you just can't tell me that there's something that's being done to execute the scheme, as I've discussed it and you haven't disagreed with on how Congress set forth this should go. That's fine. I think you have a strong jurisdictional argument, but I just want to make sure I understand that I haven't said anything wrong and that my understanding of how this works and what you're doing is correct. I'm not prepared to give a further response because we haven't briefed the issues, and I don't understand them to be before the court at this point, because 1252-F1 bars injunctions that would change the way the executive branch is implementing those divisions, which include 1231. Not individuals. That's right. So we're here on a class-wide injunction, which would be barred by 1252. That's a different question, I guess, I have. Every case, right, it's a class, but there are named people in the class. So when you issue an injunction to the class, is sort of implicit in that an injunction for that person who's named in it? If I'm understanding the matter's question, I believe that was the argument of the losing side in Alleman-Gonzalez, that a class is made up of individuals, and so any class-wide review just applies to them. That's not what I'm asking. Is he asking about the named class representative? Does this injunction, if I agree with you, that this can't extend to the class, does this injunction extend to DVD? Because that's a member of the class who's an identified individual, and all the arguments apply to that person, and so they are, to the extent we're dealing with this injunction, if that's right, could it be affirmed as to DVD, not as to maybe the class? Is that a problem, or is that just a subset of the class injunction? Is the injunction to DVD? So we would, of course, prefer an injunction narrowed only to the named class members, and the plaintiffs have suggested that the court could do that. We think that the court still couldn't do that because it raises the questions of the remaining three sets of jurisdictional bars. The plaintiffs have also suggested that perhaps the Supreme Court was resting solely on 1252F1, and we've pointed out that the Supreme Court didn't narrow the injunction to just the named class members. In the other jurisdictional bars under 1252F1, you agreed that the district court would have jurisdiction over the named plaintiffs, and therefore that we would as well. Do I understand that? If I'm understanding the question right, I believe so, Your Honor. 1252F1 cuts off, removes jurisdiction to enter a class-wide remedy, but it doesn't cut off jurisdiction over the entire case. I mean, that's what Biden v. Texas says. So it's really better to talk about the word authority. Those words are used nestled together. By the way, when we say jurisdiction, we confuse ourselves. But really what it's saying is we, the lower court, don't have authority to grant this class-wide relief. Only the Supreme Court has that authority, right? I think that Biden v. Texas recognizes that it is jurisdictional but only adds to the remedy, and so it's not saying you can't hear the case at all. And it doesn't pass on whether something like a declaratory judgment would fall outside. The most a court of appeals can do, if you're right about F1, putting aside the collateral argument, but if you're right about that, then the most a court like this can do is say, here's what the law we think is, here's why we think the government is violating it. We have a limitation on our authority. It runs only to the individuals. We are going to grant that authority. And the rest of it, Supreme Court, I guess is up to you because you now have to decide whether to grant the class-wide relief because that has been invested by Congress solely in you. Is that right? I think that's right, Your Honor. Well, what about declaratory relief? So the district court hasn't entered declaratory relief? I didn't ask that question. Is the question whether 1252F1 covers declaratory relief? Yes. Yes, so as you're aware, the position that we took in the Biden v. Texas case was that properly crafted declaratory relief would not fall outside the scope of 1252F1. It would fall outside. So courts could enter properly crafted declaratory relief, but not declaratory relief that's intended to just mock up an injunction and require the government to do it. Before we move on, I want to ask a record question. Are the parties in agreement as to who the existing named plaintiffs are? And is this moot as to any plaintiffs yet? I don't believe it's moot as to any named plaintiffs. Okay, so how many are there? I just want to update about four of them who are in the United States and not detained currently. So we have at least some named plaintiffs. No, but who are they? There's the four named plaintiffs, DVD, MM, EFD, and OCG. If I could speak to the collateral question that you referenced, Your Honor. We don't think that this is in any way a collateral effect of an injunction to enforce the Convention against Torture as implemented through FARA. The injunction is specifically targeted at 1231, which is the covered provision, and it's specifically targeted at the way the government exercises its authority under 1231. That's in no way collateral. That's the direct focus of intent. You could argue, one, this collateral thing is not a thing. I mean, Al-Aman, I think, would give you some basis to maybe say that. But you just told me this isn't collateral. So you haven't made it right now at least. You haven't made that first argument. What makes something collateral or not? I mean, they would say it's collateral because, one, obviously it's meant to enforce the CAT. That's outside of Chapter 4. That's the first thing they're going to say. And I think they're going to say, and this doesn't stop at least your ability to remove people to third-party countries, and so it is just a side note that you can, you know, have to do some process before you do it, and that's collateral. I expect both parties will run over their time, and that's just fine. So please answer.  So we've given an example in our reply brief of, say, an injunction that requires certain hygiene for officers in a detention facility if they have to wash their hands a certain number of times per day. That's an example of something. What makes that collateral versus something else? What about that to use to put that in your brief as the limits of collateral? So it's a downstream effect of a different obligation that is not imposed directly on and doesn't require the government to do something. In your hand-washing case, all right, there's some, I don't know, constitutional obligation to not infect other people with diseases, so you have to wash your hands. It could be an OSHA regulation. Okay. There's a regulation under OSHA to wash your hands. And that we have to engage in hand-washing slows down our ability to remove people because we're spending time washing our hands, not putting them on planes. Why is that? Now, you're accepting that as collateral.  We give that as an example of a collateral effect on a detention authority. It doesn't affect the government's ability to detain. It doesn't really in any way materially affect the government's exercise of its detention authority. It's really quite far removed from the government's exercise of its detention authority. How is this? I just have to give people a few hours of, you know, or whatever it is. I don't know how long the notice would be. You have to do something that's somewhere between washing hands and not removing them that's going to give them a chance to do what it seems like the law pretty clearly allows is maybe to file an application for something. And why don't you, I mean, if we accept there is a collateral exception, why is this not one of them? And what makes it of such gravity that it's different than the washing of the hands? I think the reason that this is such an easy case for that is that it so closely resembles the case in Aleman-Gonzalez, which was adding a layer of process on top of the government's exercise of a disability in 1231 itself. And so the idea that you're just adding some process on the front end doesn't mean that it's not collateral. It required the government to do something that it didn't think it was required to do. That's exactly what the Supreme Court said in Aleman-Gonzalez was too far for 1252-F1. So we do this as an easy case that follows off Warshiori from Aleman-Gonzalez itself. I mean, Aleman-Gonzalez has that footnote which we've been talking about, which I thought I had right here, but maybe I don't. But what is the kind of situation you think the Supreme Court was contemplating when it said the unlawful operation of a provision that is not specified in 1252-F1, sorry, that the court might enjoin that operation of a provision, even if that injunction has some collateral effect on the operation of the covered provision? I take it they weren't thinking about hand washing. I'm not sure, Your Honor, and they haven't given us much to go on there. I don't think the oral argument even flushed out many hypotheticals about what that would look like, other than to say that imposing additional process on the exercise of an authority in 1231 was not collateral. And what's the authority here? Authority being exercised is the 1231B authority. And it's not, and you're allowed to, this goes back to my earlier set of questions, you're allowed to slice and dice that however you see fit. So I read the statute as a whole, and it seems, strikes me as pretty obvious, that the B-2 authority is bound up with the B-3 authority, and you're allowed to just say, well, we like the B-2 part but not the B-3 part, and so we're just going to do the B-2 part, and anything you do to tell us to do B-3, sorry, that's now an interference. I mean, that's the position, right? You can isolate, this is the part of the case that troubles me, you can isolate parts of the statute without taking the statute as it is and then just say we're only applying that part that we like. Respectfully, Your Honor, I don't think that's at all what's happening here. We're not here on the B-3 claims because plaintiffs recognize that they're clearly covered by 1252F1. I don't mean to put words in their mouth, but that's how I read their brief. And I don't think that we're disregarding our obligations under the statute. Regardless, even if we were, Congress made the judgment in 1252F1 that even if there's an executive branch error, this is exactly what the court says in Aleman-Gonzalez, that that would be something that the court can't issue class-wide relief on. Congress made the assessment that it priced in executive branch errors and said courts still can't grant class-wide relief. Let me pin you down. Do you think there is, based on Aleman, a collateral exception or not? I think the court acknowledged that there could be. It hasn't asked on what the contours of that would be, and it wasn't relevant in that case, so it's probably just a tip. We haven't made the threshold argument. We're here on likelihood of success on the merits, and if I reject your hand-washing thing and I think this is collateral, let's just assume that I think it's collateral, which you say is unresolved and unexplained in the law, so I guess it would require judgment on our part. Let's say I make that judgment. Do you think then there's a likelihood of success? No, Your Honor. We would go to where there are three jurisdictional problems. But you'd be over F1 at that point. If the court concluded that it's... It is collateral. ...that 1252F1 doesn't apply, then we would be past 1252F1. Okay, so you're not taking the position that there is no such thing as a collateral exception to F1. We've acknowledged that Adam and Gonzales said that there might be sufficiently collateral things, but the one thing we do know is not collateral is imposing additional process on the executive branch's exercise of the 1232, of the 1231, excuse me, authority that the executive branch believes is not required. If I could briefly, I know I'm over my time, if I could briefly turn to 1252G and then touch on the merits. We've cited eight cases spanning pages 38 to 40 of our brief in which other circuits have rejected claims that 1252G does not bar. In other words, have concluded that 1252G does bar challenges to the lens of execution of a removal order, and specifically in the context where there are claims pending before an immigration judge or the Board of Immigration Appeals for discretionary immigration relief. That is the situation that we have here, and we think those cases are on all fours. So this brief doesn't meaningfully distinguish them, and in fact acknowledges that they involve a situation where there's a discretionary application for relief, and the executive branch chooses to execute a removal order despite that. So we think that exact one question in those cases is on all fours with these cases. Those people had filed some kind of application with the immigration authorities? Yes, Your Honor. In this case they haven't, right? Or they, the named individuals at least. I mean, this case is about people who are trying to file something, right? Right, so they're even further removed from that situation where there is an actual application pending. I believe ESL and TAWSU are the particular ones that I would direct the court's attention to as examples of reasoning that we think is persuasive for why that when to execute a removal order question is covered. The district court didn't conclude that there was a discretionary limitation, that 1252G covers only decisions that the attorney general or the DHS can make in their discretion. There's no indication of that in the statute, and a different provision of 1252 shows what it looks like when Congress crafts a jurisdictional bar that depends on discretion. There is a Supreme Court case that suggests it's about discretionary, right? Isn't there? I don't believe there is for 1252G, Your Honor. I'll ask your friends because I think they think there is. If I could just briefly touch on the merits as well, I don't mean our floor. Can I ask a question before that? Is there anything in the record or the record before us explaining how the March guidance is playing out now? Do we know what's happening on the ground? Is there anything that permits us to know that in the record? I don't think that the record is developed in that detail since the preliminary injunction was issued on April 18th, and we filed a notice of appeal on June 30th, which preceded the July 9th guidance, which is now supplemented and slightly tweaked, the March guidance. I think those questions aren't really answered in the record as it stands at this point. Before you go to the merits, can I just ask about the CAT bars that you raised? Yes, Your Honor. There are a few that could be the ones you're really relying on. Which of the provisions within the CAT do you think are the ones that preclude review? Which specific language is the one that you'd say precludes review of the injunction here or makes the injunction unlawful here? Yes, Your Honor. I'm hesitant to choose a favorite child. I think they all apply depending on exactly how you think about the claim. There's no regulation being challenged here, right, or is there? They haven't made a frontal attack on one of the regulations, but I do think they're necessarily disagreeing with 208.18c, which cuts off CAT proceedings when there is a diplomatic assurance found to be credible. It's hard to see how their claim could succeed without challenging their regulation. And there is no actual CAT claim here, right, pending? There is an individual CAT claim. And so if you had to choose your favorite child, is it the one that says a determination with respect to the policy of the CAT? That would at least be one of my favorite children, yes. Okay. So I guess my question about that is that section doesn't say no court shall have jurisdiction. It says this section shall not create jurisdiction. And I wonder if that means, okay, this doesn't create any jurisdiction, but they're not seeking to create jurisdiction under FARRA. They're seeking to create jurisdiction under the APA. And I'm wondering, does that provision, which doesn't say no court shall have jurisdiction, it says this section doesn't create jurisdiction, displace the APA? And why do you think it does? That would be an odd way to say it, where they know how to say no court shall have jurisdiction. The relevant text says nothing shall be construed as providing any court jurisdiction for any other determination except as part of the review of a final order of removal. So I do think that's indicating that any challenges that are permitted anywhere else would fall within the A5B9 zipper clause that sends them through the petition for review process. If they wouldn't have access to, right? I mean, as a practical matter or even as a not even practical, I guess this is about a half hour ago now where I walked you through and I said, you, the government, doesn't need to go back and do anything to change the final order of removal or amend it or reopen it. And so it's kind of odd to say we don't have to do anything to deal with this final order of removal, but their only way to challenge this thing that we're doing post final order of removal, they have to somehow reopen the final order of removal. That seems very strange. No, the way to get back into the PFR process that 2242D is referencing is by filing a motion to reopen or by the government filing a motion to reopen. I don't understand that. What would you say in this motion to reopen? I mean, my motion to reopen, my order says I'm going to Guatemala and now I'm not. I'm going to Sudan that has nothing to do with my final order. What am I saying to immigration judge? I think the motion to reopen would say the government has now designated country X as my country of removal. I fear torture in that country. Please let me bring a cat claim. And the IJ can then grant that motion and reopen the removal proceedings. And then when I look at the regulation, it doesn't talk about final order of removal. It talks about people having applications. So, like, where does, I mean, it seems like the regulation to at least contemplate, not that I'm filing a challenge to my final order of removal. I can file an application when appropriate. That's right, and that would happen in the reopened removal proceedings. That the application would follow the motion to reopen. The motion to reopen would be in order to file an application, yes, Your Honor. And there are no cat claims where people have brought cat claims. Forget, like, if you did give, maybe before this administration when maybe people got notice and they always went through the reopening process as opposed to just filing an application to say you can't, like in Kazum, that third circuit case. Was that a final order of removal or was it just like, now they're telling me I'm going to Egypt and I don't think they can do that and I'm challenging it. I believe that Kazum was in the context of reopened removal proceedings, but I would have to look back at the case to be confident in that answer. In a situation where it's post 90 days, so they have to ask first to respond to a reopening, and they haven't had notice until the very, almost the very moment when they're going to be removed, what are they supposed to do then? So, a couple of points on that. One is that the guidance sets out the minimum amount of time that the government can give. It doesn't in any way govern the maximum amount of time an individual can receive more time in any given instance. They can also file their motions to reopen prior to the government designating a country of removal and assert, you know, I'm afraid that the government will designate country X and I fear torture in that country. The other point I would have to speak to that is that torture is an unusual, it's an extremely high bar and if you look at the CAT cases, which I'm sure the court has seen in its work, people make astonishing allegations and they're found not to meet that bar. So, an individual who has a relationship with the government that is likely to meet that, that extremely high bar, is likely to know that quite quickly and so we think that's sort of what the guidance is contemplating. And where does diplomatic assurances come into play or does it here? So, there's two, that brings into the merits and there's two categories for people, there's two processes that are contemplated. One is for countries where the government has concluded that there are credible diplomatic assurances that an alien will not be tortured. There can be blanket assurances that specify that no alien will be tortured in that country. They can or cannot? They can be, yes, your honor. How do you think that works under a case law like Akinsanya and Murillo-Machilo and HH, where it doesn't have to be the government? It can be a rogue government person who's not exercising their obligations? I mean, it would seem impossible. How are you crediting, given what the law is about torture, at least in this circuit, how can you credit blanket assurances like that, given what the law is about what constitutes torture? Even cases where a private actor is the one who is doing torture, acquiescence requires, and this is specified in that same 208.18 regulation, acquiescence is the standard under the Convention Against Torture and it requires... We've got cases, for example, where a high-level police officer, or maybe not even high-level, but a police officer is the person who the immigrant fears is going to torture them. And we've actually granted relief in cases like that. So the assurances are just not going to be relevant there. Your honor, the Supreme Court has acknowledged in Munaf that the executive branch has the authority, has the capacity, to determine whether a diplomatic assurance is credible, and that the judiciary cannot second-guess that determination. That's outside the bounds of the judiciary. Nobody would be second-guessing the credibility of the assurance. It would be that they just don't have the facts. Your honor, that would go into the credibility of the assurance as not sufficiently convincing the government. They just can't possibly make it, because they can't know what every government actor everywhere in the country is doing at every moment, and yet our case law says those on-the-ground kind of interactions can be the basis for cat relief. They're being truthful, but they can't know it. If that were the case, your honor, if diplomatic assurances simply could never account for the possibility of every actor's behavior, then Munaf would be wrong, because it relied on the sufficiency of, quote, foreign assurances the executive branch considers reliable. And the Supreme Court said, we can't second-guess that. This is on page 702 of the decision. So it is the case, the Supreme Court has held, that there can be such a thing as reliable diplomatic assurances, and it's consigned to the executive branch, through the implementation of FARA, to determine when diplomatic assurances are credible, and respectfully, the judiciary, as the Supreme Court said, quote, is not suited to second-guess such determinations. So that's why we're able to rely on diplomatic assurances, and that's the first category of people. The second category is people for whom there's no diplomatic assurance, or a diplomatic assurance that the executive branch has not determined to be credible. And those people, that's the only category that's been modified slightly by the July 9th guidance. So those people will be given at least 24 hours of advanced notice, a minimum of six hours, even in exigent circumstances, even then only approved by high-level individuals at DHS, and even then only if they're given a meaningful opportunity to speak with an attorney during those six hours. If they then have the opportunity to assert fear of torture in the country that the government has designated, and if that would then trigger screening by USCIS. If USCIS... They're not made access to people to talk to. I mean, they have to, as I understand it, they have to affirmatively know to come forward with the fear allegation, right? And do they have access to materials to make that determination? So you say everyone should know, but I can think of circumstances. Let's say I am a gay person, and I am sent to a country, and I don't know that that country targets gay people. I can't make that claim because I don't know it without being able to research it or talk to someone. So what does this do for that person? Because I don't think you're right to say, oh, if I say that country, it'll just pop in my head, they're going to harm me. What access to make this meaningful does this give a person? So I have two points in response to that. One, this is largely modeled on the procedures for expedited removal that the Supreme Court has already found to be constitutional and verisignum, which do contemplate this sort of very fast-moving process. Second, as to whether the government needs to ask someone if they have a fear, that's based on a Biden administration policy, which found that that sort of affirmative asking was likely to produce a lot of false claims. So that's a 2024 policy that's just being reflected in the guidance. More broadly, I don't want to sit down without discussing the entry fiction, which specifies that aliens who have not been admitted to the country, which is a term of art in immigration law, don't have due process rights beyond the process provided by the political branches. That's a doctrine that stretches back to the 1890s and has been reaffirmed by the Supreme Court as recently as Thursday. The process is required by the statutes? The process is afforded by the political branches. The process is afforded by the political branches. Again, back around. They haven't raised B3, but that would be it, right? Just so I understand what you're saying. So a process can be afforded by the political branches through statutes, through regulations, through guidance. So those would be the processes that we would be looking at. And so the point is that there's no freestanding resort to constitutional due process minimums for at least a large portion of the class, which is those who haven't been admitted to the country. But when the statutes or the regulations give you a hearing, and again, like hearing and notice are, to me, synonymous ideas in that circumstance, has the statute given you that right? Yes, Your Honor, that would be a statutory right. And just to reiterate, we think we're complying with all of our obligations, and we're not asserting review bars as a way of squirreling out of our obligations. We think we went on the merits, and we think we went on the review bars that the Congress has put in place in this context. And you think you went on the merits if there were no bars at all, and we're just talking about you think the 24-hour, your answer to why this is okay under CAT and B3 is because we gave them 24 hours. Some people we gave 24 hours, and other people we received blanket assurances with some other little details. But basically, that's it. That's right, Your Honor. Everyone who's not covered by blanket assurances, which are judicially unreviewable and couldn't be reviewed in CAT proceedings, has the opportunity to raise a fear claim on a similar timeline to the expedited removal timeline that the Supreme Court has found to be constitutionally permissible. So when I was saying a half hour ago, what were you doing about B3, you'd say, well, we're giving them 24 hours. Your Honor, I would... We're giving them 24 hours. I would reiterate that we're not here on the B3 because... But you're going to be. I'm going to be faced with this question back in the district court somehow. So your answer is to both of those, we're giving them 24 hours. Your Honor, we are here defending the guidance as sufficient for due process obligations on the claims that the plaintiffs are presenting in this context, having them on the PIO. Your Honor, in CAT, contemplates under 1208.16, someone filing an application and having a hearing. And your answer, just so I understand, is that the kind of 24-hour notice in the absence of diplomatic assurances is sufficient to meet what we are required to do under CAT as far as giving the notice that makes the hearing real. Yes, Your Honor. We do think that we're complying with our obligations. You have time on rebuttal. Thank you. Thank you, Your Honor. Thank you. Thank you, Counsel. At this time, Counsel for the Appellees, please introduce yourself. May it please the Court. Trina Romero on behalf of the Plaintiffs' Appellees. I'd like to make two brief points before delving into the Court's questions and addressing some of the arguments that were just raised. First, it's indisputable that foreign implementing regulations mandate that the United States shall not send people back to a country where they're likely to face torture. Second, I'd like to bring the Court's attention to the factual findings, two sets of factual findings that the District Court made based on a mountain of evidence that was put forward. And that evidential standard is, as the Court knows, clear error. The government has not engaged with the evidence, and they have not proven that there's been a clear error. With respect to the District Court findings, first, it's impossible as a practical matter for noncitizens to raise third-country torture claims in their original proceedings. Second, the District Court found that the government put forth no evidence for its motion to reopen theory. Not just that, but that motions to reopen to raise third-country claims are, quote, routinely denied as speculative. And we put those decisions and declarations in the record below. Secondly, there are further substantive and logistical barriers to filing motions to reopen, particularly for detained individuals in fields who don't speak English and for individuals whose orders are perhaps 10, 20, 30 years old. With respect to those two sets of factual findings, it makes the government's argument completely collapse that all of these claims should be channeled through the petition for review process. As the District Court found, you can't raise the claim in the initial proceedings. Is it their answer we don't care? That's fine. You can't raise it. So what? Congress told you, go there. If you can't go there, you lose. There isn't some background authority. Like that, I thought, in their brief, I thought that's what they said. Yeah. They argue that these provisions are channeling provisions. But this court's decision in Aguilar is instructive because there the court went to great pains to say that B-9 should be construed to require that you raise claims in a petition for review process where those claims can be addressed. But it went to great pains to say claims that cannot be raised in that process, that are independent of, that arise after, that are collateral to, are not barred. And this court looked at the Supreme Court's decisions in McNary and CSS v. Reno to say that claims that relate to things that cannot be raised and that would eliminate judicial review are not barred by those jurisdictional provisions. And just briefly with respect to the government's 1252G argument, it is remarkable that they raise out-of-circuit decisions and ignore this court's decision in Kong in which this court said that 1252G, relying on the Supreme Court's decision in AADC v. Reno, applies only to discretionary decisions. And the protections that the PI seeks to enforce are mandatory protections by FARA and by the regulations. Now I'd like to clear up a little bit of confusion about the 1252F1 argument and what Al-Aman said and didn't say. But first, as a threshold matter, I want to make clear that FARA is a separate act and it is not part of 1231. The fact that it appears codified as a statutory note, Congress did not instruct that FARA be included as a statutory note. In fact, it's the Office of Law Revision Counsel who put it there. But the Supreme Court has twice said that designations made by codification without Congressional approval should be given no weight. So we know that FARA is not part of the INA. And importantly, it's undisputed that FARA is not covered by 1252F1. It only applies to the provisions of Chapter 4 of Title II of the INA. And critically, FARA did not amend the INA. It was enacted two years after – sorry, it was not amended by IHRA-IHRA. It was enacted two years after. I guess I agree with everything you're saying, but I guess I don't know where it leads because they say that what the injunction does is there's authority to exercise under B2, which is to remove people to third-party countries. That's a Chapter 4 requirement. We are doing that, and you are putting up a block of delay, whatever word you want to put on it, some kind of impediment to us doing that as expeditiously as possible. And so you are – the injunction interferes with the operation of the removal procedure, which is under Section 4. So, I mean, everything you may say be true, but it still runs into that argument at least. Well, I mean, as a threshold matter, if you find that FARA is not covered by 1252F1, that's right. Because they can't dispute that, and in fact agree with that because they agreed with that position in Moreno-Galvez, the government has to take the position that this is going to impact something in a covered provision of 1252F1. But I want to just remind the Court that the PIA doesn't block third-country removals. It allows for third-country removals because it specifically says prior to removing to a third country. It changes the operation of how they do third-country removals. Getting to the collateral point, absolutely. Footnote 4 of Al-Aman says that a court may enjoin the unlawful operation of a provision that's not specified, even if it has a downstream collateral effect. And what's really instructive, what the Supreme Court gave us, is it cites to a Ninth Circuit decision in Duran-Gonzalez, which is precisely like the situation we have here. In that case, the Ninth Circuit deferred an injunction enjoining application of a policy and requiring compliance with an uncovered provision, the Adjustment of Status statute, which is not in 1252F1, and a regulation. And it imposed the requirement that it must be complied with before the initiation of reinstatement proceedings, which are in 1231, 1231A5. But the court found that removal was collateral, got a little bit of delay, with a collateral effect of the unlawful practice of denying adjustments, even though DHS was then in the process of attempting to reinstate proceedings. And so the collateral effect cited in the example given to us by the Supreme Court is a brief delay of carrying out the proceeding. And I think that that's really instructive. I think that since Alderman, several circuit courts have affirmed that 1252F1 does not bar injunctions to uncovered provisions, even if it has a collateral impact. And we've pointed the court to Texas v. DHS, and Eletrolado v. EOIR, and to the government's point that this somehow impinges upon the operations, which we vehemently disagree with, the Fifth Circuit rejected that precise argument when it held that Alderman prohibits injunctions, when it rejected the argument that Alderman prohibits injunctions that the government views as impacting its ability to enforce covered provisions. The government views. The Fifth Circuit said that position is badly mistaken. Congress decides which provisions are covered, and the executive branch doesn't get to add proposed additions. And then we would also sort of direct the court to Eletrolado v. EOIR, and Gonzalez v. ICE, all of which are cited. Can I just ask you quickly about Eletrolado? Yes. So there, if I'm remembering that case correctly, that's where the Ninth Circuit says that asylum law is collateral to removal. Asylum 1158 is the asylum statute. It's not a covered provision. The court there enjoined what we call the transit rule, a rule that impacted eligibility for asylum, and the Ninth Circuit said that injunction is permissible because 1158 is not covered by 1252F1, even though it may have some impact on that individual's removal proceeding. Does that make sense? Yes. I guess I was thinking about that case, and then here, a noncitizen can only apply for cap protections in the removal context, right? Correct. And so, like, when we're thinking about what's collateral to removal, Eletrolado seems a little bit different than what we're dealing with here. Sure. I mean, what we're dealing with here is sort of, as I mentioned, more akin to Duran-Gonzalez, where there's an injunction against a policy memo and acting to enforce the adjustment statute. Here, the preliminary injunction enforces FARA and the implementing regulations. It says the district court did not prohibit third-country removals. It said prior to any third-country removal, we have to comply with our cap obligations. And with respect to the named plaintiffs, they were permitted to, in footnote 51, the district court implies the authority to apply for withholding to those named plaintiffs because F1 doesn't cover individuals. But as to the class, the district court ensured protections that would safeguard their due process rights to notice and an opportunity to raise their cap claim. Judge Howard asked this of the government, but the four existing named plaintiffs are still in this case, is that right? And they're the named plaintiffs that we have. And they are still under threat of third-country removal because they have final removal orders. Absolutely. So there's no question that... What do we make of the fact that the Supreme Court issued a stay in which they had the burden in the Supreme Court to show likelihood of success in the merits, and they succeeded? And while we didn't get an opinion to say which of the arguments demonstrated likelihood of success, one of them did, Justice Sotomayor, at least in her dissent, which is the only thing we have from the Supreme Court, at least seems to say F1 seems like the closest call. So that's what we have. Our job as the inferior court here is to do the best we can. It would seem a stretch to say, oh, they didn't know what they were doing, so we're just going to do something else. That would be an odd thing to do. And then I'm trying to think about reading at least between the lines. It looks like F1 was the place where at least those who were in disagreement acknowledged that's the closest call. Or maybe they just wanted to have considered a briefing before they addressed that issue. Okay. That's another possible reading of it. But I will say that we submitted a 28-J letter where the Ninth Circuit just last week issued a ruling despite the fact that the Supreme Court had issued a state ruling against them. They said that they rejected the government's argument that that ruling was controlling. And we gave this court in the 28-J letter examples of other cases in which the Supreme Court ruled opposite of what their decision on the shadow docket was. So it's not fair to say that this court, when looking at the PI in its totality, right? I mean, I'll just say F1 to me is the most troubling part because, I mean, I guess they agreed that there's a collateral exception. But, I mean, if you look at Aleman, in the text of the opinion, they identify the possibility of this exception with a perhaps in italics. And then in footnote four, they don't really endorse anything. They just say, well, there's, you know, this was referenced in passing and there's some other case maybe out there. I mean, that's all that there is on your side. And yet on their side is the idea that this is, like, Aleman is, aside from that little part, it's a very broad opinion that's talking about interference with operations of removal. And the case was about grabbing the Constitution to impose another procedure on top of detention. And they're saying now you're grabbing a statute and putting another procedure on top of removal. And that doesn't seem that different to me. It is completely different because Aleman was talking about an injunction that acted against 1231A6, which is a cover provision. So the entirety of the court's discussion is about an injunction that acts on Wouldn't they say it's acting on 1231B2 or B1? That we have the authority to remove people from their party country? It's not because the plain language of the injunction says prior to. So it's a downstream effect of a little bit of a delay to give people due process and to comport with FARA and the implementing regulations. So I — The court says, I mean, a court enjoins conduct when it issues an injunction that tells someone what to do or not to do. And I think they would say B2 lets us send people to third-party countries. And you're issuing an order telling us we can only do that if we do these other things. And that if is telling us what to do as we decide how to operate 1231B2 and our authorities. But there is no constraint on the B1 or B2 authority to select a third country whatsoever and to carry out that statutory third-country removal. We did not challenge the court's ability or the ability of the government to select, to designate and execute third-country removals. What we challenged in the preliminary injunction, separate and apart from the merits, is that FARA requires that we comply with our torture obligations before we do a quick bait-and-switch, tell people they're going to one country and then send them to another country. And it's extremely problematic under the government's process because their position is that no notice is required. If they have diplomatic assurances, no notice is required. And we know that the Supreme Court, Mallain, AARP, Glover v. Kelly, it's textbook, right, that people are entitled to notice at an opportunity to raise a claim. And that's what makes the government's memo so troubling. And if we move to diplomatic assurances... Just to clarify for me, have any of the four had hearings on their attempted CAT claims? So plaintiff O.C.G. had been deported. He won withholding of removal to Guatemala. The government turned him over to Mexico. Mexico then turned him back over to Guatemala. The district court ordered O.C.G.'s return. He was placed back in removal proceedings, and now he is raising a fair-based claim to Mexico, but only because the district court intervened. And his removal was based... There was a falsified declaration that came out below that, in fact, he was never notified he was going to Mexico and asked if he had a fear. So he's getting a hearing? Yeah. Has it actually had a hearing and a ruling? Well, you know, his reopen proceedings are kind of about at a rare time. People right now are not getting hearings. Plaintiff O.C.G. is an individual named Plaintiff in this case. Yeah, I'm asking about him. Yeah. So he's back in reopened proceedings, making a fair-based claim to Mexico. But they're pending.  Thank you. Yeah. Sorry. How did he do that? Did he reopen his final order of removal, or did he file some other document called an application? He went through the process outlined in the P.I., which is that he got a reasonable fear screening, which is a lower screening than what the government thinks should be the standard. He got a reasonable fear screening to Mexico. He passed that reasonable fear screening, and then the proceedings were reopened to allow him to go. By the government? Who does that? I think that was by a joint for the government, yeah. How does this work if you had more notice? Let's say it was notice you thought was constitutionally permissible. What happens? So they don't have to reopen? The government doesn't have to do anything, right? Can you clarify what happens now? What would happen? Like under the law as it is. So what you're saying you don't have is enough notice. Let's say there was enough notice. Then what happens? Do these people have to reopen their hearings, or do they do something else? So what happens under the P.I. if they get an opportunity to present their fear claim, and if they pass it, the government has to reopen proceedings so they can go before an I.J.? What if there was no P.I., and we're in a world where the government just had a different policy, which is people get a month before they're sent to a third-party country, and they can consult with a lawyer, and they can do whatever they need to do. They can have a computer, whatever. Then if that were the world, what would happen? What would a person do if they thought, I can't be sent there? What would they do? So if they were previously in removal proceedings, they would seek to reopen those removal proceedings based on a definitive statement by the government that they're intending to deport them to a third country. And if they weren't previously in removal proceedings, they would predict that they would... I just don't understand why that is, where the government's not amending the removal order that by rule has to state a country, and they don't think that document needs to be changed. Why does the person think the document needs to be changed, as opposed to some other, like, I can't be sent to this place that's not in my removal order? They're not trying to put it in the removal order. I'm trying to make sense of their channeling argument, because what you're saying to me is if the world works right, it does get channeled through final orders of removal proceedings, and I'm just wondering why that is, where they're not trying to change the final order of removal. Well, because we know from the statute and the regulations, both in the withholding and the CAT context, that only immigration judges can grant that protection. And so that is the statutory... So there's no, like, ability, I guess, you know, that the regulation refers to an applicant. And I'm wondering, is there an application that someone can file for withholding or CAT relief that is separate from my final order of removal? Well, they would have to have that application be submitted to an immigration judge, and the immigration judge would only consider it if proceedings were reopened. That's how immigration court works. They don't adjudicate applications for final order of people. It just doesn't happen. Not a thing. It's not a thing. So, you know, in a different world where there's more time granted, the mechanism, say you would advise your clients, is file a motion to reopen based on the government's new information that they're now going to deport you to this third country we didn't talk to you about before. And that is funneled through a motion to reopen to an IJ. Correct. And that's basically what the district court agreed with. And in doing so, it's interesting that the district court looked to the attachments to the complaint, which was a 2001 and a 2019 draft forms that were promulgated by the government itself, providing notice of the third country and providing a 15-day stay before that removal could be executed to allow the person to seek to reopen proceedings. And so the PI puts in place a set of protections that makes sense. It makes sense to have a lower screening for reasonable fear, not the exacting standard that the government thinks people should be able to show in six hours or 24 hours if they have the wherewithal to know, to say, I'm afraid of that third country because the government doesn't ask. And what is happening in practice is people are rapidly being deported to third countries, including people who say they try to articulate a fear claim to third countries very quickly. And with respect to the record in this case, six of the men who were deported to South Sudan on July 4th remain in government custody in South Sudan. The diplomatic assurances that the government claims are credible are not worth the paper they are written on. They just deported people to Ghana based on diplomatic assurances, and that's in the 28-J in the record. And Ghana turned around and deported them to the countries that a U.S. immigration judge found they would be tortured in. Is there any mechanism in place that prevents that, the chain refoulement that moved to the other countries? No, absolutely not. There is nothing. And that is partly the problem with diplomatic assurances. And when we talk about MUNAS, there were individualized assurances in that case to the country that the person was going to be deported to. Not a third country. It's not a third country case. And I think that that is notable because MUNAS and Kayamba do not stand for the proposition that blanket assurances are okay. And the district court... Individual people, the assurances in MUNAS? Yeah, there are individual people assurances in those cases. But the government places some challenge, and the district court didn't delve into any substantive executive decision about diplomatic assurances. The district court was looking at the question of the overall process and whether or not blanket assurances comported with the Constitution and found that they did not. And of course they did not. Can I ask a question about what would happen if... Do you think... When you said footnote 51 earlier, are you saying... Do you think the court has issued injunctions to the individuals and the class? Only the class? Are individual injunctions included within? Individuals and the class. Individual named plaintiffs can't get the 1231 protection because they're not... Do you think the court has issued them that? Well, the court has...  Yes. Yes. I mean... What do you mean? I mean, I guess I'm trying... Yeah. In one way, the individual named plaintiffs are just a subset of the class, and so if you grant an injunction to the class, I presume you grant it to the individual named plaintiffs as well, but you're saying yes, but why? And what in the record is suggesting that? I am saying that because we did not request injunctive relief under FARA for the named plaintiffs. We requested it under 1231 withholding B3 for the named plaintiffs. And the district court... Granted that at note 51? Yeah.  Our position is we granted that with respect to them, but they represent a class of people. I guess what I'm asking you is I'm trying to imagine what happens in this case if we ended up disagreeing with you about F1, that does not preclude this court from issuing an individual injunction, I think, but I'm trying to figure out would that be we are affirming in part, we are modifying or changing an injunction he didn't grant, and then do we have the authority to do that? And that's what I'm trying to figure. Absolutely. The court has the ability to review and modify the preliminary injunction with respect to the named plaintiffs because they are not covered by F1. It should keep an injunction in place as to the named plaintiffs. So there's a stay in place now, but the injunction pending the moving toward permanent injunction, what do the named plaintiffs need in your view? Would the terms of the existing injunction that the district court had ordered suffice? This is with the 10 days. Does OCG need that time relief? Absolutely. The fact that OCG is in proceedings protect OCG. Sure. Because all of the class members and all of the names. I'm just talking about the four named. Yeah, yeah. They all could be on the third country merry-go-round where they could have the protections in place, but if they don't prove, you know, if they prove that they have a fear, if OCG proves that he has a valid fear to Mexico, the government can just fuck out another country, like it's sending people to Cameroon right now, and then OCG would have to prove that he's afraid to go to Cameroon. And this gives him the notice that he's on the table now.  Right. But we hope the court will see our 1252 F-1 argument. But I need to think through. Like this case is at a preliminary stage. There's a lot to happen. The Supreme Court, at least one way of viewing F-1, retains the authority ultimately. If I disagree with you on F-1, then they retain the authority to give you what you want. If I think this, if we think this, court doesn't. But I'm trying to understand how we think that all works. Well, it's not as preliminary as I think the court might think. We argued partial summary judgment on some of our causes of action before the district court in December. So the merits of declaratory relief, which is perfectly permissible under this court's decision in Brito and other courts have so held, right, are on the heels of this decision. Well, it's also permissible under the order that we issued in this case. Yeah. What has he, he has not ruled yet? The district court has not yet ruled our motion for partial summary judgment. Okay. But we expect that we'll be back here. So a possible outcome here is you will soon have a declaratory judgment. You might, if we here disagreed with you about the extent of our power under F-1, you might end up with a modified injunction for the individuals. And then what would happen next? At what point, I mean, the declaratory judgment they could choose to honor, they could choose not to. I don't think you have a great, as I understand the law, you don't have much of a remedy on that. I will be clear that we sought declaratory judgment and APA set aside relief with respect to the government's third country policy. And that's pending now. And so if he were to set aside, that would be setting aside the guidance? Correct. And then if you set aside the guidance, what do you left? Let's say you win that. So he sets aside the guidance and he gives you a declaratory judgment. The declaratory judgment would basically say, I think the law requires notice? Yeah, we think it would say the law requires that the government follows the process, the steps for selecting, for sequencing, for selecting the third country, right? Remember, there was a guy from Mexico and South Sudan, and Mexico always takes its nationals, so they're not going through sequencing. And then it would say people have a right to notice the third country and a meaningful opportunity to raise their claims for persecution and torture. So before the district court is the withholding MCAT argument, right, because 1231B3 isn't implicated in 1252F1. So you would end up with, your hope is to end up with an order setting aside guidance and a judgment that says here are the process that the law, I'm announcing that the law requires that this following sequencing of steps be followed before anyone can be removed to a third-party country. And that then those people get notice, meaningful notice, and an opportunity to raise a protection claim. And either they, being the government, will appeal that, follow it, or not follow it. Correct. We expect that they will appeal it. They've said many times they plan on taking it back to the Supreme Court. And that's coming soon, some version of that. We hope so. We hope to have consolidated. We're hoping to be back here and we would ask this court to do expedited briefing. Given all of that, what is this case, given the stay, that won't be interfered with? And I know you moved and maybe we didn't make the right call, but we're here to ask questions and understand what the right thing to do here is. So if we granted whatever we do here, you can't, that won't change the facts on the ground because of the stay that's in place from the Supreme Court. Right. And if you don't go with us here, we would ask that it be a narrow ruling because the same jurisdictional arguments are going to percolate back up. Not with respect to 1252F, but with respect to the other provisions that the government is raising. Right. And so if I disagreed with you about F1 and we said modified injunction to the individuals, that really doesn't change very much for right now. Correct. You could theoretically appeal to the Supreme Court now, theoretically saying we modified or reduced your injunction. That would be your choice. I imagine, given what you just told me, that wouldn't be the best litigation strategy because you're waiting for what seem like better remedies that you think you might get soon. Am I at least making sense? I'm trying to understand what's happening. You are making sense. And, you know, we acknowledge that the PI is inoperable and has been inoperable since June 23rd. But we're also seeing the horrors on the ground of what the dissolution of that PI has done to class members who are in far-flung countries. And so we are trying to get back. But the Supreme Court stayed the PI through any subsequent Supreme Court decision, you know, and that's months away. Okay. And after Judge Murphy rules, you would have to come back through this court. Yeah, unless the government employed some kind of crazy tactic, okay. Yeah. But if I could address the due process rights of our class members very briefly, I mean, I think the whole expedited removal, their guy-sam line of argument is just a red herring, and I think Judge Murphy saw that as well. Their guy-sam is about people who are seeking entry into the United States. Our clients have final orders. And so the applicable Supreme Court decision is really Zedvitus, in which the Supreme Court held that people with final orders have due process rights and any plenary power is subject to constitutional limits. And it's interesting that in their guy-sam itself, the Supreme Court actually cites to Zedvitus to contrast people who are arriving at the border with others who have final orders. And so the citation to Zedvitus is telling there, and it's telling you that our class members have due process rights. And we know that's been affirmed by AARP and JGE versus Trump in this last term. Let's see. So you moved originally back to the stuff we were talking about a minute ago. So you were the ones who moved to dissolve the injunction or go back to Judge Murphy to have him dissolve the injunction, forget this appeal. We asked for an indicative ruling from Judge Murphy that he would dissolve the appeal if this court remanded for that purpose. He agreed to do that. Yes, but we had to ask this court to do that remand, which was denied. What was the government's position here? The government fought tooth and nail to try to keep the PI in effect, even though the PI is against the government. What was the government's position here on the remand? That it should not be remanded and that we should be here today fighting about an inoperable preliminary injunction. Do you still think it should be remanded? Do I still think? Yes. Yes, I do. I'm happy to move the court to reconsider the final ruling with respect to that motion as well. And that's just because nothing is going to really change for you no matter how this goes? It's a needless litigation because we can get to the Supreme Court on the merits at the same time, if not close to the same time, as we can on the PI. And that's just the reality of the fact of the Supreme Court's order. Sorry, do you have a question? No. Oh, I have lots of questions. Please, I'm here to answer them. No, that's fine. Why don't you, you're welcome to make concluding remarks. My simple conclusion is simply that the court finds the district head's jurisdiction an authority to issue the preliminary injunction and to affirm the injunction. And then my other ask would be, please reconsider your decision not to remand to dissolve the injunction. Thank you. Thank you. Thank you, counsel, this time the counsel for the government. Please reintroduce yourself on the record. Good afternoon. Sarah Welch for the government. I'm going to start where my friend wrapped up with whether to remand. We oppose remand because our position is that we win. There should not be further proceedings in the district court. This case is jurisdictionally barred, so there's... I follow that what could happen that you would like is any of the other sort of like some of the other bars, but if you just think about F1 for a minute, which I'll just be transparent with you, I think is your strongest argument. If that's how the case shakes out and you were to prevail and the injunction is reduced to the individuals, let's just assume that, does the government gain anything from that that's helpful? I'm not sure that I'm understanding... I mean, you said you wanted to be here, and I can understand you made a whole bunch of arguments. And if you won some of them, they could interfere with... Well, not interfere, but they could tell judge... Let's assume Judge Murphy wants to enter a declaratory judgment. I have no idea, but I'm making that assumption right now. And if we said certain things, that may run into what he may be thinking absent us saying something. I get, right? Right. I think to say what I think is the same thing. We think we should win ultimately, not just with respect to the individuals, but the court should dismiss based on, for example, 1252G that says, you can't hear these claims at all, not just you can't enter this form of relief. Right. And if it... And then, okay, let's just assume you didn't get any of that. But what you got is a narrow ruling that says Judge Murphy did not have the authority, and we do not have the authority to gain class-wide relief. Lower courts do have the authority to grant individual relief. We think there's a likelihood of success for the individuals. So we reduce or dissolve or modify or clarify the injunction. That's what we do. What impact does that have? Is that anything helpful to the government? Or if that's what it would be, the government would just as soon deal with the case as it comes up from the court as a permanent decision of the district court. So I agree that there would be no practical change on the ground given the Supreme Court's say. I do think that that precedent would be helpful to the government to establish 1252F1 covers this sort of claim. And as a result, only the four individual plaintiffs could receive relief from the district court. So I do think that would be helpful. That would be meaningful for the government. And that is a reason that we're resisting a remand. I do want to, while we're on the topic of the Supreme Court's say, I do want to discuss the Ninth Circuit case that my friend cited as supplemental authority, which I think is instructive on the Supreme Court's efforts in this space. So the Ninth Circuit concluded that, of course, it wasn't bound by the Supreme Court in its disposition of the case. That was the case's second trip to the Ninth Circuit and its second trip to the Supreme Court. So the Ninth Circuit had also previously concluded in an appeal of an APA preliminary remedy under Section 705 that the government was likely to lose. That went up to the Supreme Court, and the Supreme Court entered a say. When the case came back, the Ninth Circuit again denied a say because it concluded that the Supreme Court's previous say shouldn't influence how it decided the case, and the Supreme Court granted another say. So the Supreme Court is at least viewing these things as controlling its subsequent decisions. Your brief in the beginning makes some vague references to the say or some assertions to the say, but there was really no section of the brief that said we have to win because the Supreme Court issued a say in which it had to have found likelihood of success on the merits. I mean, you didn't take that sort of very sort of direct position. Why not? I think it's highly relevant, and the Supreme Court has said in Boyle that its previous determination in Wilcox controlled its determination. It's perhaps not as clear, and courts have been resistant to our arguments, that Supreme Court stays should have tremendous or perhaps controlling weight on the merits. We know it's really hard to see how they wouldn't have controlling weight as to the equitable factors. The irreparable harm to the government seems to be conclusively established by a Supreme Court say, and the balance of the equities again seems to be conclusively established by a Supreme Court say, even if the court has doubts about whether it controls as to the likelihood of success on the merits. I still have a little bit of confusion about one part of the record. There are three plaintiffs, those except for OCG, the named plaintiffs. Where are they now? Are they in the third country? Okay, well, why not given that there's a stay in place? I'm not sure the answer to why they're not in the third country. I assume that the government has chosen not to execute removal orders against them, but I would have to go back to the client. What country are they in? They're in the United States, and they're not currently in detention. That's the last update that I received recently on that. As to any of the three of them that we're talking about here? All four of them, DVD, MM, EFD, and OCG, they're all in the United States. They're not in detention? They're not in detention. Why is that? I mean, your brief starts with, these are the people who are the worst of the worst. I know at least one is out on bond based on a requirement to conduct bond hearings. I can't speak to the others in detail. We're happy to provide supplemental information to the court on that. It's not in the record, as it stands. It has to do with the thrust of the brief, which is, you know, we only use this for the worst of the worst, and then you're saying these people are just people who somehow don't need to be detained. I think the thrust of the brief is that third country removal is most often needed as a last resort for individuals whose home countries won't take them back because of their egregious conduct. I don't think we've claimed that everyone in the class falls into that category. Do you have the authority to speak for the government in terms of what will happen with, I just want to talk about the three because OCG seems to me to be a different case. The named plaintiffs, the three, during the continued pendency of the proceedings in this case. By this case, I mean district court here, Supreme Court. I haven't spoken to my clients about that, and so I would not be able to make representations about that. I did want to touch on just a couple of other points, and I'm grateful for the court's time. First, as to the 1252-F1, the court is considering affirming as to only the four named plaintiffs. I just wanted to emphasize that that would require the court to reject all of our other sets of jurisdictional bars as to those plaintiffs and to rule against them on the merits as to those plaintiffs. So 1252-F1 isn't, of course, the only bar that we're starting, and the court would need to address the rest of our arguments in order to issue a ruling like that. Second, as to the collateral arguments, I wanted to clarify that it's a necessary, all of Gonzalez tells us that it's a necessary condition of collateralness that the injunction be enforcing a separate provision of law, an external provision, but that's not sufficient. Both the majority and the dissent agreed, all nine justices agreed, that constitutional claims, which, of course, are enforcing an external law on a covered provision, would be barred by 1252-F1. So the fact that they're saying that they're relying on Kat and Farah to... So I follow that, and I guess I tried to make that argument to them, but then they do have the collateral footnote that talks about another statutory provision, and I guess I don't understand that. So I mean, I guess I understand what you said, but then you also said, well, we agree, or we will take what Al-Aman said, and Al-Aman does seem to say, if we accept that as a real statement, that other statutory provisions can have collateral effects. So I guess I don't follow it. So I think the two key things we know from Al-Aman that are responsive to that, one, external source of law is necessary but not sufficient since constitutional claims are covered, as we've discussed. Two, the external source of law's effect on the covered provision would have to be something other than requiring the government to operate that provision in a way other than it understands it needs to be offered. So requiring the government to do something, it understands itself not to be required to do, or to not do something, it understands itself to be allowed to do. I think that probably leaves a pretty narrow window because it's hard to think of that situation, and Justice Alito pressed the advocate at oral argument to try to give him an example of that, and none was offered. So I think it's a small case where that could be possible. Do we have a washing the hand example because you really can't think of one? I think there would be something in that vein where it really doesn't affect the government's operation of the covered provisions. The last point I wanted to make was that my friend referenced the credibility of assurances with respect to a couple of other countries, and so they're not worth the paper that they're written on. Respectfully, I think that's directly in the teeth of Munaf, saying that courts can't second-guess the reliability of diplomatic assurances. I don't see, if that's their argument, I don't see how they can square that with Munaf. Was Munaf about individual people? It was, and I don't think that saying that the – I don't think the judiciary is any way better suited to second-guess a more complex executive branch determination that blanket assurances are credible than a less complex determination that individual assurances are credible. They focus on language, right, that authorizes diplomatic assurances that does seem targeted at a person, not just broad, wide assurances, right? They refer to assurances that an alien is the language, will not be tortured. And so an assurance that no alien will be tortured suffices to establish that any individual alien will not be tortured. But that's the legal thing that hinges on whether that refers to individuals or whether that can be construed the way you just said it, right? It doesn't really have to do with second-guessing of what the State Department says. It's this kind of assurance, the kind of assurance that CAT permits, which is broad assurances. And I guess I don't think that's been done until now. I mean, Munaf was an individual. That other Third Circuit case was an individual. So that's at least a change in how you view that authority. I'm not saying it's right or wrong. I'm just asking what's happening. That's a change. I don't have an answer on the historical practice of whether blanket assurances have been used before. The candidate would be surprised if they hadn't, but I'm not confident on that. But we view it as a textual argument that the use of the singular itself doesn't indicate that something has to be made on an individualized case-by-case basis, which this court ruled in another immigration case, the Lana Dovey-Nome, just a few months ago. The court rejected a similar argument that the use of the singular required the determination to be made on an individual case-by-case basis. And second, we argue that even if there is a requirement of an individualized determination, that requirement can be discharged. It's well-established in administrative law. That sort of requirement can be discharged through broader determinations, like a rulemaking that says this kind of evidence is sufficient to establish XYZ. With thanks to the court's indulgence on extra time, the government requests that you reverse. Thank you. Thank you, counsel. That concludes arguments.